UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

CRIM. NO. 23-269 (JRT/DLM)

---

United States of America,

                   Plaintiff,

v.

Keontae Quentrell Jones,

                   Defendant.

**MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE OBTAINED IN VIOLATION OF THE FOURTH AMENDMENT**

---

Defendant, through his attorney, has moved the Court under Rule 12 of the Federal Rules of Criminal Procedure for an order suppressing all physical evidence obtained as a result of unlawful searches and seizures. (ECF Doc. 24.) At a motions hearing held on November 1, 2023, the Court heard testimony from Agent Jeffrey Fischbach, who executed the ion scan on Mr. Jones's apartment, prepared the search warrant affidavit, and executed the resulting search warrant on the apartment, locating the evidence Mr. Jones has moved to suppress.

In support of his motion, Mr. Jones now offers the following:

# ARGUMENT

## I. AN ION SCAN IS "UNDOUBTEDLY" A FOURTH AMENDMENT SEARCH REQUIRING A WARRANT UNDER *JONES*, *KYLLO*, AND *JARDINES*.

"It is important to be clear about what occurred in this case: The Government physically occupied private property for the purpose of obtaining information. We have no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted." *United States v. Jones*, 565 U.S. 400, 404-05 (2012) (citing *Entick v. Carrington,* 95 Eng. Rep. 807 (C.P. 1765)). "[F]or most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ('persons, houses, papers, and effects') it enumerates." *Id*. at 406. "Where, as here, the Government obtains information by physically intruding on a constitutionally protected area, such a search has ***undoubtedly*** occurred." *Id*. at 407 n.3 (emphasis added).

What *Jones* considered a Fourth Amendment search is exactly what happened here. Here, there was a trespass upon Mr. Jones's door. The officer testified that he made direct, physical contact with Mr. Jones's doorknob and the deadbolt locking mechanism on the front door of the apartment, rubbing the swab against the door. (*See* T. 31.) He testified that he employed a ruse to distract Mr. Jones or

his neighbors from noticing the sight and sound of the swabbing by placing a coupon in a plexiglass holder on the door. (*See* T. 32.)

In *Jones*, law enforcement placed a GPS tracking device on a car owned by the defendant's wife but driven by him regularly, giving him "at least the property rights of a bailee." *See id*. at 404 n.2. Looking over the text and history of the Fourth Amendment, *Jones* observed that property rights lay at the heart of its protections. Because the government "trespassorily inserted the information-gathering device" upon a car in Mr. Jones's possession, it was "undoubtedly" a Fourth Amendment search. *Id*. at 410; *see also id*. at 404 (holding that the installation and subsequent monitoring were separate Fourth Amendment searches).

And that was just a car, a simple Fourth Amendment "effect" that didn't even belong to Mr. Jones himself. Here, we are considering governmental intrusion upon a person's home. "With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (citations omitted). "'At the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Id*. (quoting *Silverman* v. *United States*, 365 U.S. 505, 511 (1961)).

*Kyllo* also tells us plainly that the ion swab here was a Fourth Amendment search. "Where, as here, the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant." *Kyllo*, 533 U.S. at 40. Or, put another way, "obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical 'intrusion into a constitutionally protected area,' *Silverman*, 365 U.S., at 512, constitutes a search — at least where (as here) the technology in question is not in general public use."

In *Kyllo*, the Court examined the use of an infrared thermal-imaging device aimed at a house to explore heat radiating from various parts of the house and how it compared to neighboring houses, which would ostensibly confirm the use of marijuana grow lamps inside. *See* 533 U.S. at 29–30. This was a search, because "where, as here, the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a search and is presumptively unreasonable without a warrant." *Id*. at 40. *Kyllo* rejected the dissent's attempted

distinction between "off the wall" and "through the wall" observations, finding no meaningful Fourth Amendment difference. *See id*. at 36.

The agent here agreed that the ion-scan device is not in general public use. (*See* T. 30.) He agreed that using the device on the outside of the apartment allowed him to perceive information that he could not otherwise sense, and that its use on the outside would give him information about the inside of the apartment. (*See* T. 31, 32.) Indeed, the search was more obvious here than in *Kyllo*, because at least there the agents stood some distance from the house to employ their device, while here the sense-enhancing technology was employed in direct physical contact with Mr. Jones's home itself.

*Jardines* also makes plain that the search here was unconstitutional. Whether considered as an intrusion upon the curtilage or upon the home itself, the ion swab here was easily a search under *Jardines*. As Justice Scalia explained in *Jardines*, "[o]ne virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy. That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred." *Id*. at 11. This was so despite the holding of *Illinois v. Caballes* that dog sniffs on automobiles are not Fourth Amendment searches because "official conduct that does not compromise any legitimate

5

interest in privacy is not a search subject to the Fourth Amendment." 543 U.S. 405, 409 (2005) (cleaned up). As *Jardines* pointed out in a footnote denying the relevance of *Caballes*, the Supreme Court has "held, over and over again, that people's expectations of privacy are much lower in their cars than in their homes." 569 U.S. at 14 n.5. And, in rejecting the government's arguments regarding the longstanding use of drug-sniffing dogs, *Jardines* explained that *Kyllo*'s holding "that surveillance of the home is a search where 'the Government uses a device that is not in general public use' to 'explore details of the home that would previously have been unknowable *without physical intrusion*'" necessarily implied "that when the government uses a physical intrusion to explore details of the home (including its curtilage), the antiquity of the tools that they bring along is irrelevant." *Id.* at 11 (quoting *Kyllo*, 533 U.S. at 40 (emphasis in *Jardines*)); *see also Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018) ("When a law enforcement officer physically intrudes on the curtilage to gather evidence, a search within the meaning of the Fourth Amendment has occurred.") (citing *Jardines*, 569 U.S. at 11) (holding that an officer's act of lifting a tarp off a motorcycle parked in a partially-enclosed driveway next to a house was a Fourth Amendment intrusion upon the curtilage requiring a warrant, rejecting the government's argument that the automobile-exception to the warrant requirement permitted the search).

6

To paraphrase *Jardines*, one benefit of Justice Scalia's opinions in *Jones*, *Kyllo*, and *Jardines* is that they make every effort to provide the clearest possible statements of the requirements placed on law enforcement. *See*, *e.g.*, *Kyllo*, 533 U.S. at 40 ("We have said that the Fourth Amendment draws 'a firm line at the entrance to the house.' [*Payton v. New York*, 445 U.S. 573, 590 (1980)]. That line, we think, must be not only firm but also bright—which requires clear specification of those methods of surveillance that require a warrant."). Given the clarity of the holdings in *Jones*, *Kyllo*, and *Jardines*, the unconstitutionality of the warrantless ion swab is abundantly apparent.

## II.  DOG SNIFFS ARE "SUI GENERIS," AND SO THE LAW OF DOG SNIFFS CANNOT AUTHORIZE THE UNCONSTITUTIONAL SEARCH HERE.

The Supreme Court has made quite clear that contraband-sniffing dogs are sui generis and therefore not comparable to other types of searches. In *United States v. Place*, 462 U.S. 696, 707 (1983), the Court held that a dog sniff of a traveler's luggage was not a Fourth Amendment search because of the limitations of the information it revealed. *Id*. It only exposes the presence or absence of contraband, while disclosing nothing else about the contents of the luggage. *See id*. These limitations meant the dog sniff was "*sui generis*." *Id.*

The Supreme Court came back to the idea of the dog sniff as *sui generis* in *Caballes*, which upheld the use of roadside dog sniffs of automobiles. Distinguishing *Kyllo*, the Supreme Court again emphasized the unique nature of a dog sniff, because "governmental conduct that *only* reveals the possession of contraband 'compromises no legitimate privacy interest.'" *Id*. at 408. It was therefore not a Fourth Amendment search under the *Katz* theory of Fourth Amendment protections.

As discussed above, *Jardines* rejected the application of *Caballes* to searches of the home, because the home receives far greater protection from the Fourth Amendment than cars. *See* 569 U.S. at 14 n.5. But even if we weren't dealing here with a person's home, the ion swab and scan is not limited to just detecting the presence or absence of contraband. The agent agreed that the ion-swab test could detect "lawful or unlawful substances," and he specifically added that it could test for "anything that is a medicine and/or a controlled substance." (T. 30.)

In *Kyllo*, the Court was concerned that thermal-imaging device "might disclose, for example, at what hour each night the lady of the house takes her daily sauna and bath — a detail that many would consider intimate." 533 U.S. at 38 (cleaned up) (noting, however, that "[t]he Fourth Amendment's protection of the home has never been tied to measurement of the quality or quantity of

information obtained," and emphasizing that *any* intrusion upon the home's interior was too much). Where the ion-scan device can detect, by the agent's account, "***anything*** that is a medicine, " the details revealed by this testing are far more intimate than the simple bathtime hypothesized in *Kyllo* and going well beyond the presence/non-presence of contraband in the car sniff upheld in *Caballes*. *See Caballes*, 543 U.S. at 409–10 ("The legitimate expectation that information about perfectly lawful activity will remain private is categorically distinguishable from respondent's hopes or expectations concerning the non-detection of contraband in the trunk of his car."). The government's reliance on dog-sniff caselaw is therefore misplaced.

### III. THERE CAN BE NO *DAVIS* GOOD-FAITH EXCEPTION WITHOUT BINDING APPELLATE PRECEDENT AUTHORIZING THE UNLAWFUL SEARCH.

The exclusionary rule is subject to an exception under *Davis v. United States*, 564 U.S. 229 (2011), but that exception cannot apply here, and in fact its logic shows why the principles of deterrence are especially important here. *Davis* ruled that the exclusionary rule should not be enforced against "[r]esponsible law-enforcement officers" who "will take care to learn 'what is required of them' under Fourth Amendment precedent and will conform their conduct to these rules." *Id.* at 241. Those same responsible law-enforcement officers should not be

punished "when binding appellate precedent specifically *authorizes* a particular police practice[,]" because "well-trained officers will and should use that tool to fulfill their crime-detection and public-safety responsibilities." *Id.* (emphasis in original).

Here, no "binding appellate precedent" authorized the search. The government has conceded that "[t]o date, the United States Court of Appeals for the Eighth Circuit has yet to rule on the legal parameters surrounding the use of ion scan technology[,]" and that, overall, "[l]egal precedent concerning the constitutionality of ion scans performed without a warrant is limited." (Govt's Resp. to Def. Motion to Suppress Evidence, ECF Doc. 28, at 6, 7.) The agent here testified that he was only aware of a single decision on the issue from a single Minnesota District Court Judge sitting in Blue Earth County. (T. 34–35.)

Even under *Davis*'s stringent view of the exclusionary rule, important principles of deterrence would support its application here. "When the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Davis*, 564 U.S. at 238. Here, against the clarity of the principles outlined in *Jones*, *Kyllo*, *Jardines*, and other long-standing opinions

of the U.S. Supreme Court, the officer chose to rely on a single district court case to intrude upon the protected area of Mr. Jones's home.

*United States v. Perez*, 46 F.4th 691 (8th Cir. 2022), excused a possibly unlawful dog sniff of an apartment door under the *Davis* good-faith exception, but its reasoning shows why *Davis* should not be applied here. One criticism of *Davis* when it was decided was that it would thwart the evolution of Fourth Amendment caselaw, and *Perez* shows how this has happened with apartment dog sniffs. *Perez* involved the use of a drug-sniffing dog at an apartment door. The Eighth Circuit decided in 2010 that this was not a search, *see United States v. Scott*, 610 F.3d 1009, 1016 (8th Cir. 2010), but despite multiple requests the Circuit has never considered whether *Scott* should be good law after *Jardines* because, every time it comes up, the search has been upheld under good faith. In *Perez*, the majority opinion written by Judge Kelly upheld the denial of suppression under *Davis* because *Scott* excused the search, while she was forced to relegate to a solo concurrence actual consideration of whether the search was constitutional after *Jardines*. *Compare Perez*, 46 F.4th at 697–98 (noting that, at the time of the search in that case, "we had neither expressly overruled *Scott* nor explained how *Jardines* applies to apartment doors in a common hallway," and so it was "reasonable for the officers to rely on our then-applicable precedent"), *with Perez*,

11

46 F.4th at 704–707 (Kelly, J., concurring) (discussing at length why the dog sniff "was a violation of Perez's Fourth Amendment rights").

By contrast, the Seventh Circuit had no pre-*Jardines* precedent authorizing an apartment door dog sniff, and so *Davis* did not prevent that circuit from finding it an unlawful search after *Jardines*. *See United States v. Whitaker*, 820 F.3d 849, 854-55 (7th Cir. 2016) (observing that "no appellate decision specifically authorizes the use of a super-sensitive instrument, a drug-detecting dog, by the police outside an apartment door to investigate the inside of the apartment without a warrant," and so "the officer could not reasonably rely on binding appellate precedent, and the good-faith exception does not apply."); *see also United States v. Hopkins,* 824 F.3d 726 (8th Cir. 2016) (ruling that *Jardines* prohibited the warrantless dog sniff of an apartment door located on the *outside* of an apartment building, rejecting *Davis* good faith because *Scott* had only authorized a dog sniff for an *inside* apartment door within a common hallway).

As shown in *Whitaker*, *Hopkins*, and Judge Kelly's concurrence in *Perez*, the implications of *Jardines* to apartment-door dog sniffs are clear—when they can be considered. So *Scott* hasn't survived *Jardines* because it's ***right***; *Scott* has survived merely because *Davis* has thus far prevented the Eighth Circuit from even considering the requirements of the Fourth Amendment in light of *Jardines*. *See*

*United States v. Hines*, 62 F.4th 1087, 1092–93 (8th Cir. 2023) (upholding an apartment-door dog sniff by quoting *Perez*'s explanation that the Eighth Circuit has "neither expressly overruled *Scott* nor explained how *Jardines* applies to apartment doors in a common hallway"). Judge Kelly wrote a unanimous majority opinion in *Perez* upholding what her concurrence explained was an illegal, unconstitutional search. It was a concurrence and not a dissent only because *Davis* requires the result.

Here, though, we do not have that concern, because *Davis* does not prevent the Fourth Amendment issues from being considered. Neither the agent nor the government can point to any appellate precedent authorizing this unconstitutional search, and so it cannot be excused through *Davis* good faith. As the agent testified, he or others were aware that a warrant might be required for the test, because they held a meeting to discuss it. (*See* T. 34 (agreeing that it did occur to them that this might be a search requiring a warrant).) The agent made the decision to execute the warrantless search based on a single order from a single district court judge, without consideration of any other precedents. (T. 35 (agreeing that the agents only discussed the Blue Earth County order and that they did not discuss "any other cases, either from federal court or appellate

13

courts").) That slim reed is insufficient to excuse the Fourth Amendment violation here.

*Davis* held that law enforcement officials are expected to know their obligations under the Fourth Amendment and binding precedent interpreting it, which is why they can appropriately be excused when acting according to precedents specifically authorizing conduct later determined to be unlawful. At a minimum, law enforcement should know what the Supreme Court says about the Fourth Amendment, but the agent testified that no one brought up any other decisions by any other court. But against the single Blue Earth County trial-court order, binding precedent from the U.S. Supreme Court has clearly held that:

- *Jones*, 565 U.S. at 404-05: "The Government physically occupied private property for the purpose of obtaining information. We have no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted."

  "[Q.] And so you are taking this swabbing thing and rubbing it on the doorknob and then rubbing it on the deadbolt lock.
  A. That is correct.
  Q. Okay. And at the risk of asking an obvious question, why are you doing that?
  A. To see if there's trace amounts of a controlled substance on the door."
  (T. 31–32.)

  "[Q. T]his is not detecting particles in the air. You are rubbing it directly against the door.
  A. That is correct." (T. 31.)

- *Kyllo*, 533 U.S. at 34: "[O]btaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical 'intrusion into a constitutionally protected area,' *Silverman*, 365 U.S., at 512, constitutes a search — at least where (as here) the technology in question is not in general public use."

  "[Q. T]he point of this technology is that it allows you to see things that you can't see with your own eyes, correct?
  A. That's correct.
  Q. Or detect things that you can't see with your own eyes. And those things are actually physically on the door. Is that fair to say?
  A. That's correct." (T. 31.)

  "Q. So it may be a physical contact on the outside [of the apartment], but your assumption is that it will give you information about what's on the inside.
  A. That is correct." (T. 32.)

  "[Q. T]his is not something that is in general public use.
  A. That is correct." (T. 30.)


- "The officers were gathering information in an area belonging to Jardines and immediately surrounding his house—in the curtilage of the house, which we have held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner." *Jardines*, 569 U.S. at 5–6.

  "[Q. Y]ou hoped [Mr. Jones] would not suspect anything if he heard any noises at the door.
  A. That is correct.
  Q. Because you wanted to be undetected.
  A. That is correct." (T. 32.)

"[Q.] When you went to Mr. Jones's door, did you have any other purpose than taking the ion swab?
A. That is correct, just taking the ion." (T. 35.)

No reasonable officer could have believed the search was authorized by a single district court order in light of all these clear statements from the U.S. Supreme Court about the requirements of the Fourth Amendment. The unconstitutional search therefore cannot be excused by good faith.

### IV.   THE *LEON* GOOD-FAITH EXCEPTION DOES NOT APPLY WHEN PROBABLE CAUSE IS ESTABLISHED, IF AT ALL, THROUGH AN ILLEGAL SEARCH.

Similarly, when we turn to the consequence of this unconstitutional search, the government cannot rely on the *Leon* good-faith exception. "In order for the *Leon* good faith exception to apply to a warrant based on evidence obtained through a violation of the Fourth Amendment, 'the detectives' prewarrant conduct must have been close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable." *United States v. Cannon*, 703 F.3d 407, 413 (8th Cir. 2013) (quotation omitted). The relevant inquiry is not subjective but instead "is confined to 'the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" *United States v.*

*Hopkins*, 824 F.3d 726, 733 (8th Cir. 2016) (quoting *United States v. Leon*, 468 U.S. 897, 922 n. 23 (1984)).

As discussed above, no reasonably well-trained officer would have believed that the warrantless ion swab was a constitutional search, and the search here was not close to the line of validity. The holdings of *Jones*, *Kyllo*, and *Jardines* clearly emphasize the importance of the home and the necessity of a warrant when executing a search. *Jones* held a warrant was required to trespass upon a car for the purpose of gathering information. *Kyllo* held that a warrant was required to employ sense-enhancing technology to reveal private details of the interior of a home, even without making contact with the home itself. *Jardines* held that a warrant was required to physically intrude on the home to gather information, even when not making direct physical contact with the home itself. Moreover, *Davis* held that law enforcement was permitted to rely on "binding appellate precedent" authorizing a law-enforcement practice, and so a single trial-court order would not be enough to overlook this clear Supreme Court caselaw.

The rules were clear. A reasonable officer would have known that physically intruding on Mr. Jones's home with sense-enhancing technology for the purpose of gathering information was a Fourth Amendment search requiring a warrant.

17

The test is objective, and so the agent's subjective beliefs are irrelevant. The search here was not close to any reasonable line of validity, and so the agent cannot claim the protections of the *Leon* good-faith exception.

### IV. WITHOUT THE UNCONSTITUTIONAL SEARCH, THE AFFIDAVIT HERE FAILS TO ESTABLISH PROBABLE CAUSE TO BELIEVE CONTRABAND WOULD BE FOUND IN MR. JONES'S APARTMENT.

"The sufficiency of a warrant affidavit which contains information from an unlawful search is evaluated after deleting that information." *United States v. Hernandez-Leon*, 379 F.3d 1024, 1027 (8th Cir. 2004) (citing *United States v. Templeman,* 938 F.2d 122, 124-25 (8th Cir. 1991)); *see also United States v. Johnston,* 876 F.2d 589, 594 (7th Cir. 1989) (Posner, J., concurring), cert. denied, 493 U.S. 953 (1989) (citing "[l]oads of court[s] of appeals cases" holding that a redaction analysis is the proper test for affidavits containing tainted information).

The search warrant application here, stripped of the unconstitutional search, fails to establish probable cause because it relies entirely on the conclusory statements of two "cooperating defendants," without any information establishing the veracity, reliability, or basis of knowledge for any of the accusations. As stated in *Illinois v. Gates*, 462 U.S. 213, 230 (1983), these factors "are all highly relevant in determining the value" of an informant's report. These factors are not independent considerations, but all play into whether the totality

of the circumstances establish that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id*. at 238. A weak showing on one factor can be remedied through a strong showing in another factor. *See id*. at 233–34. The key inquiry in such cases is whether the information is reliable. *United States v. Key*s, 721 F.3d 512, 518 (8th Cir. 2013). The affidavit "should be examined under a common-sense approach and not in a hypertechnical fashion." *United States v. Williams,* 10 F.3d 590, 593 (8th Cir. 1993).

As stated in the affidavit supporting the search warrant affidavit:

> Your affiant and other members of the Minnesota River Valley Drug Task Force (MRVDTF) had previous unconnected controlled substance cases involving two (2) separate parties who will be here on named / called cooperating defendants, had mentioned that Keontae Quentrell Christopher Jones DOB: [redacted] was previously and currently trafficking and selling controlled substances in the Mankato area.

> In all cases, Agents with the MRVDTF were informed that Jones was selling counterfeit oxycodone pills typically containing fentanyl ("blues" or "Mbox 30's") and cocaine. Agents were also informed by another cooperating defendant that Jones had made mention that he had previously sold 'm-box 30's to Bryan Gerald Mortensen DOB: [redacted]. It should be noted that Mortensen had passed away from a fentanyl overdose on 09/01/2022.

> Your affiant also has a previous open controlled substance case on Jones from April 2022 in which Jones was found in bed with a child while smoking marijuana. Fentanyl pills were also located in the residence. Jones is out on bail from this case and per conditions should stay law abiding.

19

> Your affiant looked up Jones in the mobile computer system - CIS
> and was unable to locate his address however found it in on
> Statewide Supervision System (S3) for his probation. Jones reporting
> address is [redacted] Mankato, 56001. This address was also
> partially confirmed by one of the cooperating defendants during a
> statement in which they said Jones lived in Highland Hills
> Apartments.

(Govt. Ex. 3 at 3.)

The agent explained that "cooperating defendant" means "someone who has

been caught up in a case themselves and that they are cooperating with law

enforcement and they are also giving information and/or doing whatever they

can to help themselves out." (T. 26.) The agent did not himself work directly with

these two cooperators. (*See id*.)

"An informant's tip can be sufficient to establish probable cause if the

informant 'has a track record of supplying reliable information' or if the tip 'is

corroborated by independent evidence.'" *United States v. Gabrio*, 295 F.3d 880, 883

(8th Cir. 2002) (quoting *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993)).

According to the affidavit, the two cooperating defendants here had "previous

unconnected controlled substance cases" "mentioned" that Mr. Jones

"previously and currently trafficking and selling controlled substances in the

Mankato area." The affidavit provides no information about when these

defendants in "previous" cases were mentioning that Mr. Jones was "currently trafficking" controlled substances, and so there is immediately a question about the freshness of the information.

The affidavit makes no statement about the cooperating defendants' credibility or veracity. There is no "track record of supplying reliable information." There is, indeed, no explanation for why two people "doing whatever they can to help themselves out" should be believed.

Eighth Circuit cases have sometimes found informant credibility to be increased when they make statements against their penal interest, implicating themselves in criminal activity the police would otherwise not know about. *See*, *e.g.*, *United States v. Reivich*, 793 F.2d 957, 959 (8th Cir. 1986) (citing *United States v. Harris,* 403 U.S. 573, 583-84 (1971)). Here, though, there is no express or implied statement against interest, because the affidavit makes no attempt to explain how these two cooperating defendants came to know what they "mentioned" about Mr. Jones. There is no allegation that they were personally involved with Mr. Jones in drug trafficking, and the affidavit's description of the cooperators' controlled-substance cases as "unconnected" implies that they were not. There is nothing to suggest the tip was "based on the informant's first-hand observations, not merely from rumor or innuendo." *Williams,* 10 F.3d at 594. If the informants'

information were simply "mention[ing]" what they'd heard, nothing was provided to the magistrate to assess the credibility of the hearsay information.

Likewise, caselaw suggests that the depth of detail in an informant's tip is strong evidence of credibility. *See Gates*, 462 U.S. at 234 (holding that an informant's "explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight"). Again, the tips here fail. The two cooperators make a conclusory allegation that Mr. Jones was selling fentanyl and cocaine at some point in the past, with not a single description of any particular drug sale. There is a third, even more mysterious cooperating defendant about whom we know even less who alleges that Mr. Jones "had made mention" that he "previously" sold fentanyl to a man who died.

Caselaw does suggest that known informants may be considered more credible than anonymous sources because they could face consequences for lying to police officers. But the statements here are so vague and conclusory that it would be difficult to imagine how they could lead to consequences. For the cooperating defendants, giving these kinds of vague tips ("Mr. X has been dealing fentanyl"), which could be based on nothing more than "rumor or innuendo," *see Williams,* 10 F.3d at 594, is low-risk, high-reward. If their tip turns

22

out to be accurate, they get the reward and see their sentence shortened or even eliminated. If police investigate and find no proof of Mr. X dealing fentanyl, the tipster has easy deniability, because maybe it was true in the past but isn't now. The statement about supposedly selling to the specific individual carries little risk when the only person who could confirm or deny that allegation is deceased.

Officers may be able to establish informant credibility through corroboration of details demonstrating reliability or basis of knowledge, but the limited corroboration here does neither. One cooperating defendant said that Mr. Jones lived in the Highland Hills Apartments, and he did. According to the agent, though, the Highland Hills Apartments is a complex containing "a lot of student housing for Mankato State" and "close to probably 30" buildings (T. 14, 15.) Taken in context, then, the accuracy of a statement identifying neither the building nor the unit in a massive complex implies a limited rather than an intimate knowledge of Mr. Jones's life. Corroborating this innocent detail did little to bolster the credibility of the informant's tip.

Nor does the reference to the "previous open case" provide significant corroboration, especially considered in the totality of the circumstances. The affidavit's description of that open case says only that Mr. Jones was "found in bed with a child while smoking marijuana" and that "[f]entanyl pills were also

located in the residence." (Govt. Ex. 3 at 3.) There is no allegation that Mr. Jones's "previous open case" involved distribution rather than personal use, and of course as an "open case" there was no conviction.

"In addition to probable cause that contraband or evidence of a crime will be found, 'there must be evidence of a nexus between the contraband and the place to be searched.'" *United States v. Randle*, 39 F.4th 533, 536 (8th Cir. 2022) (quoting *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000)). The Eighth Circuit "ha[s] not adopted a per se rule to the effect that probable cause to arrest a drug trafficker establishes an inference that records, paraphernalia, and other evidence of drug trafficking exists at the trafficker's residence." *United States v. Ross*, 487 F.3d 1120, 1123 (8th Cir. 2007). But the Eighth Circuit has "found probable cause to exist in cases in which officers have stated that in their experience such an inference is appropriate and in which a supporting affidavit also described a defendant's continuous course of drug trafficking activity." *Id.*

Here, the evidence was insufficient to show that Mr. Jones was a "drug trafficker," let alone one engaged in a "continuous course of drug trafficking activity." And the evidence that Mr. Jones's alleged drug trafficking involved the address searched was even more lacking. The affidavit established that Mr. Jones had reported the address to probation, but no one even saw him at the reported

24

address. The affidavit alleges that a car registered to Mr. Jones' girlfriend was seen parked near the apartment, but no evidence that he himself was ever present. Given that there was no evidence of any actual drug sale that anyone had ever witnessed, there was of course no evidence that Mr. Jones had ever gone to a drug deal from the apartment or returned to the apartment after a drug deal. The affidavit fails to establish a sufficient basis to believe that evidence of drug trafficking would be found in Mr. Jones' apartment.

The tips here were vague and conclusory, and the affidavit provided insufficient evidence to establish probable cause based on the "highly relevant" factors of veracity, reliability, or basis of knowledge. While *Gates* tells us that a weak showing on one factor may be compensated by a strong showing on another, here the showing on all of the factors, whether analyzed independently or collectively, are all disturbingly weak. Because neither *Davis* nor *Leon* prevent the application of the exclusionary rule here, Mr. Jones respectfully asks the Court to recommend that his motion to suppress the evidence found during the ion swab and scan, and the subsequent apartment search, be granted in its entirety.

## CONCLUSION

The officer here violated Mr. Jones's Fourth Amendment rights by searching his home without a warrant. When the results of that unconstitutional search are removed from the warrant application to search Mr. Jones's apartment and when the affidavit is analyzed without recourse to the *Leon* good-faith exception, the affidavit fails to establish the necessary probable cause to support the search. Mr. Jones respectfully asks the Court to recommend that his motion to suppress be granted.


Respectfully submitted,


Dated: December 6, 2023          /s/ Steven J. Wright
                                 Minnesota Attorney #387336
                                 331 Second Avenue South, Suite 705
                                 Minneapolis, MN  55401
                                 Phone: 612-669-8280
                                 Fax:  612-341-0116

                                 Attorney for Defendant