# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 23-cr-0269(1) (JRT/DLM) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Keontae Quentrell Jones, | |
| Defendant, | |

On August 30, 2023, Keontae Jones was charged by indictment with one count of Possession with the Intent to Distribute Fentanyl in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B), and one count of Possessing a Firearm in Furtherance of a Drug Trafficking Crime in violation of 18 U.S.C. § 924(c)(1)(A). (Doc. 1.) This matter is before the Court on Mr. Jones's Motion to Suppress Evidence Obtained in Violation of the Fourth Amendment. (Doc. 24.) The case has been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1.

The Court held an evidentiary hearing on Mr. Jones's Motion to Suppress on November 1, 2023. (Doc. 34.) Andrew Dunne, Esq., appeared on behalf of the United States of America ("the government"). Steven J. Wright, Esq., appeared on behalf of Mr. Jones, who was present at the motion hearing. The briefing on this matter concluded on December 27, 2023. For the reasons stated below, the Court recommends that Mr. Jones's Motion to Suppress Evidence be granted in part and denied in part.

## BACKGROUND

At the motion hearing, the Court heard testimony from City of Mankato Police Officer Jeffery Fischbach. The government offered and the Court received Government Exhibit 1, IONSCAN Verification; Government Exhibit 2, IONSCAN Results; Government Exhibit 3, an application, search warrant, and inventory return of Mr. Jones's apartment at XXXX Monks Avenue, #XXX, Mankato, MN 56001, Blue Earth County District Court; Government Exhibit 4, an evidence photo of Mr. Jones's apartment door at XXXX Monks Avenue, #XXX, Mankato, MN 56001; Government Exhibit 5, a Google Map image of the Hickory Hills Apartments in Mankato, MN;[1] and Government Exhibit 6, a Google Street View image of XXXX Monks Ave., Mankato, MN 56001. Mr. Jones did not offer any exhibits. (*See generally* Doc. 40.[2])

The evidence presented at the motion hearing established the following. On December 1, 2022, law enforcement officers from the Minnesota River Valley Task Force ("Task Force"), including Officer Fischbach, conducted an ion swab of the outside doorknob and locking mechanism to Mr. Jones's apartment. (Tr. at 7–9.) Officer Fischbach testified that eight months before the ion swab was conducted, in April 2022, Mr. Jones had been a defendant in a different drug trafficking case. (*Id.* at 9.) Then, in November 2022, "cooperating defendants on other cases" stated that Mr. Jones "was still selling

---

[1] The government's exhibit list identifies Exhibit 5 as a Google Map image of the Hickory Hills Apartments (Doc. 38) but Exhibit 5 identifies the location as the Highland Hills Apartment Building. (Gov't Ex. 5.)
[2] For ease of reference, the evidentiary hearing transcript (found at Doc. 40) will be cited as "Tr." followed by the page number associated with the citation.

fentanyl pills . . . and cocaine in Mankato and [the] surrounding area." (*Id*. at 9–10.) One of the cooperating defendants also told the Task Force that Mr. Jones was living in an apartment in the Highland Hills apartment complex. (*Id.* at 11.) Task Force officers "checked on S-3, which is a statewide supervision system, [the state of Minnesota's] probation system, and [saw]" that Mr. Jones's address was listed as XXX at XXXX Monks Avenue in Mankato, then confirmed that the apartment was in the Highland Hills complex. (*Id*. at 10–11.) Officer Fischbach testified that Mr. Jones's apartment building contains three floors of apartments. (*Id*. at 15.) The building has two unlocked entrances, one on the north side and one on the south side. (*Id*. at 15–16.) The doors open directly to a set of stairs leading to each apartment floor. (*Id*. at 39.) There are four apartments per floor on the north side, and four apartments per floor on the south side, with a total of eight apartments on each floor. (*Id*. at 15–16.)

According to Officer Fischbach's testimony, law enforcement conducted the ion swab on Mr. Jones's door "[t]o see if [there were] trace amounts of a controlled substance" on the door, because "[i]f there [were] trace amounts of a controlled substance on the door, then there [would be] a good, high chance that there [would be] controlled substances inside the apartment." (*Id*. at 32.) During his testimony, Officer Fischbach also agreed that the purpose of conducting an ion swab is to detect things that are physically present, but undetectable by the human eye. (*Id*. at 31.) While the swab only made physical contact with the outside of the door, Officer Fischbach agreed that the swab would provide information about what was on the inside of the door. (*Id*.)

3

Officer Fischbach testified that before going to Mr. Jones's apartment to conduct the ion swab, he and the other Task Force officers discussed whether they needed a warrant to swab Mr. Jones's apartment doorknob and locking mechanism. (*Id.* at 20–21.) The officers concluded that they did not need a warrant because a Minnesota Fifth Judicial District Court[3] judge had recently held that if the apartment door where a swab was performed was in a common hallway where the access doors into the space are unlocked, no warrant was necessary. (*Id.* at 21.) The officers discussed no other cases relating to ion swabs. (*Id.* at 35.)

Officer Fischbach and another officer conducted the ion swab of Mr. Jones's apartment door on December 1, 2022. (*Id.* at 16.) The officers took a "clean sterile ion swab and swab[bed]" the doorknob and the locking mechanism above the doorknob. (*Id.* at 16, 17.) After the officers sealed the swab in an envelope, they took it to be scanned at a law enforcement center in St. Paul because it was the only place in the state that Officer Fischbach knew of with an IONSCAN machine. (*Id.* at 18, 30.) The scan showed a positive result for cocaine. (*Id.* at 20.)

On December 6, 2022, Officer Fischbach applied for a search warrant to search

> Keontae Quentrell Jones, Date of Birth XX/XX/1998 and XXXX Monks Ave # XXX, Mankato, MN 56001 [which] is a multi unit complex which is a brick covered building/apartment complex which sits in Highland Hills Apartments. Unit# XXX is on the third floor which could be considered the second floor as the first floor is partially the basement and is on the southwest corner of the building.

---

[3] The Court takes judicial notice of the fact that Mankato is within the State of Minnesota's Fifth Judicial District. *Accord* Fed. R. Evid. 201.

4

(Gov't Ex. 3 at 4.)

> The basis for the search warrant included the following:
>
> Your affiant and other members of the Minnesota River Valley Drug Task Force (MRVDTF) had previous unconnected controlled substance cases involving two (2) separate parties who will be here on named [sic] / called cooperating defendants, had mentioned that Keontae Quentrell Christopher Jones DOB: XX/XX/1998 was previously and currently trafficking and selling controlled substances in the Mankato area.
>
> In all cases, Agents with the MRVDTF were informed that Jones was selling counterfeit oxycodone pills typically containing fentanyl ("blues" or "Mbox 30's") and cocaine. Agents were also informed by another cooperating defendant that Jones had made mention that he had previously sold "m-box 30's["] to [person] DOB: XX/XX/1988. It should be noted that [person] had passed away from a fentanyl overdose on XX/XX/XXX.
>
> Your affiant also has a previous open controlled substance case on Jones from April 2022 in which Jones was found in bed with a child while smoking marijuana. Fentanyl pills were also located in the residence. Jones is out on bail from this case and per conditions should stay law abiding.
>
> Your affiant looked up Jones in the mobile computer system - CIS and was unable to locate his address however found it in on Statewide Supervision System (S3) for his probation. Jones [sic] reporting address is XXXX Monks Ave# XXX, Mankato, MN 56001. This address was also partially confirmed by one of the cooperating defendants during a statement in which they said Jones lived in Highland Hills Apartments.
>
> Your affiant and other Agents with the MRVDTF located Jones [sic] vehicle which is a 2007 Lexus IS, silver in color, bearing MN license plate# XXXXXX, parked next to the XXX building and was 20 feet from the entrance of apartment XXX. This vehicle is registered to Jones's girlfriend[.]
>
> Based on your affiant's training and experiences, it is common for trace amounts of controlled substances to be recovered from door handles, including locking mechanisms, used by those involved in distribution and storage of controlled substances. Thus, your affiant on 12/01/2022, wiped a sterile swab on the exterior door handle, to include the locking mechanism, located at XXXX Monks Ave# XXX, Mankato, MN 56001, and to test the swab for trace amounts of controlled substances to include fentanyl and other controlled substances.

> On Thursday, December 1st 2022, Agents, utilizing a new/sterile 500DT Narcotics Swab, collected a sample from the exterior door handles/locking mechanisms of XXXX Monks Ave # XXX, Mankato, MN 56001, as part of an ongoing controlled substance investigation.
>
> The swab utilized to collect any potential trace evidence, showing the presence of a controlled substance, was immediately packaged in a latex glove and placed into a manila envelope after collection.
>
> Your affiant took custody of the packaged [sic], and transported the swab to the Minnesota National Guard Counter Drug Task Force center located in St Paul, Minnesota for analysis.
>
> On 12/01/2022, a certified operator of the Smith's IONSCAN 500DT instrument examined the sample swab collected from XXXX Monks Ave# XXX, Mankato, MN 56001. The ION Scan analysis indicated an alarm, and detected a presence for cocaine.
>
> Your affiant was provided two printed documents. The first document indicating a verification had been conducted. The second document included the alarm presence for cocaine. It should be noted, the comments section of the printed document reads an address of XXXX Warren St APT# XXX however it should have read, XXXX Monks Ave# XXX.
>
> Your affiant transported the sample swab, and associated documents back to the Blue Earth County Justice Center. The sample swab was placed into evidence, and the documents added to the case file.

(*Id*. at 5-6.) Blue Earth County District Judge Bradley Walker issued the requested warrant. Law enforcement officers executed the warrant and seized incriminating evidence from Mr. Jones's apartment. (*Id.* at 12.)

## ANALYSIS

Mr. Jones moves the Court to suppress the results of the December 1, 2022 ion swab and scan conducted on the doorknob and locking mechanism of his apartment door, and suppress any evidence discovered as a result of a search warrant for Mr. Jones's apartment,

which law enforcement obtained on December 6, 2022. Mr. Jones asserts that law enforcement needed to obtain the search warrant *before* conducting the ion swab and scan on the doorknob and locking mechanism of his apartment door because it constituted a search for Fourth Amendment purposes. He argues that the search went beyond the common area of the apartment hallway, and intruded on the apartment door itself, which according to Mr. Jones is "an area clearly protected under the Fourth Amendment." (Doc. 24 at 2.) He also argues that if the Court were to suppress the result of the ion swab, the Court should also suppress all evidence discovered during the warranted search of Mr. Jones's apartment because without the ion swab's positive result for cocaine, the search warrant application would have failed to establish probable cause.

The government, for its part, contends that law enforcement officers did not need to obtain a search warrant for the ion swab because there is no reasonable expectation of privacy in generally accessible spaces like the shared hallway outside Mr. Jones's apartment door. The government also argues that the search warrant application established probable cause even without the ion scan results, but even if the warrant application were flawed, the evidence is still admissible under the *Leon*[4] good-faith exception to the exclusionary rule.

---

[4] *United States v. Leon*, 468 U.S. 897 (1984).

I.   **In the Eighth Circuit there is no generalized expectation of privacy in the common areas of an apartment building, but Fourth Amendment rights do not rise and fall on this alone.**

The Eighth Circuit has rejected the idea that a generalized expectation of privacy exists in the common areas of an apartment building. *United States v. McCaster*, 193 F.3d 930, 933 (8th Cir. 1999) (citing *United States v. McGrane*, 746 F.2d 632, 634 (8th Cir. 1984). In *United States v. Scott*, the Eighth Circuit held that a narcotic dog sniff of an apartment door frame in a common hallway did not constitute a search subject to the Fourth Amendment because it did not "compromise any legitimate interest in privacy." 610 F.3d 1009, 1016 (8th Cir. 2010) (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)) (cleaned up). In that case, Mr. Scott argued that the Court should extend to dog sniffs the United States Supreme Court's holding in *Kyllo v. United States* "that obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical intrusion into a constitutionally protected area, constitutes a search[.]" *Scott*, 610 F.3d at 1016 (quoting *Kyllo*, 533 U.S. 27, 28 (2001)) (cleaned up). In declining to do so, the Eighth Circuit noted that "the Supreme Court rejected such an interpretation of *Kyllo* in *Caballes*." *Scott*, 610 F.3d at 1016 (citing *Caballes*, 543 U.S. at 409–10). The Eighth Circuit contrasted the thermal imaging technology at issue in *Kyllo* with narcotics dog sniffs stating that "unlike the thermal imaging technology . . . narcotics dog sniffs are not capable of detecting lawful activity" and therefore do not implicate a person's reasonable expectation of privacy. *Id*. (quoting *Caballes*, 543 U.S. at 409) (cleaned up).

8

But a person's "Fourth Amendment rights do not rise or fall" on privacy alone. *United States v. Jones*, 565 U.S. 400, 406 (2012). For most of our country's "history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ('persons, houses, papers, and effects') it enumerates." *Id.* at 407. And the "reasonable-expectation-of-privacy test has been *added to,* not *substituted for*, the common-law trespassory test. *Id.* at 409.

Mr. Jones urges this Court to find that the ion swab of his apartment doorknob and locking mechanism is a search under *United States v. Jones*, *Kyllo v. United States*, and *Florida v. Jardines* because the officers unconstitutionally intruded on his home when they came into physical contact with his door, *Jones*, 565 U.S. at 407, n.3, using a "sense-enhancing technology," *Kyllo*, 533 U.S. at 34,[5] to "explore details of the home that would previously have been unknowable without physical intrusion," *id.* at 40. Mr. Jones asserts "[t]hat the officers learned what they learned only by physically intruding on [his] property to gather evidence is enough to establish that a search occurred." (Doc. 45 at 5 (quoting *Jardines*, 569 U.S. 1, 11 (2013)).

---

[5] Mr. Jones asserts that an ion swab procedure is like the thermal-imaging device in *Kyllo* because Officer Fischbach agreed with him during cross-examination "that the ion-swab test could detect 'lawful or unlawful substances,' and he specifically added that it could test for "'anything that is a medicine and/or a controlled substance.'" (Doc. 9 at 25 (quoting Tr. at 30).) But Officer Fischbach clarified in his next sentence that the testing he was referencing was not the ion scan procedure performed at the National Guard Counter Drug Task Force Center in St. Paul using the ion swab data, but was rather testing that officers conducted at the Blue Earth County Justice Center on items recovered during the execution of the search warrant. (Tr. at 30.)

In *Jones*, the United States Supreme Court held that "the Government's installation of a GPS device on a [suspect's] vehicle, and its use of that device to monitor the vehicle's movements, constitutes a search." *Id*. 565 U.S. at 404 (cleaned up). Rather than basing its decision on the defendant's expectation of privacy, the Court relied on the "significance of property rights in search-and-seizure analysis." *Id*. at 405. Explaining its reasoning, the Court contrasted its decision with the conclusion it came to in *United States v. Karo*. *Jones*, 565 U.S. at 409–10. The *Jones* Court explained that in *Karo*, the Court held that no search had occurred when the government installed an electronic tracking device in a container "with the consent of the original owner" and "the container is delivered to a buyer having no knowledge" of the device's presence. *Id.* at 409 (quoting *United States v. Karo*, 468 U.S. 705, 707 (1984)) (cleaned up). Because the government "came into physical contact with the container only *before* it belonged to the defendant" and "the defendant accepted the container as it came to him, [tracking device] and all" he "was therefore not entitled to object to the [device's] presence, even though it was used to monitor the container's location." *Id.* at 410 (emphasis added). But the Court found that the facts were different in *Jones*. Because Mr. Jones possessed his vehicle "at the time the [g]overnment trespassorily inserted the information-gathering device[]" the Court held that a search had indeed occurred. *Id*. The Court concluded that by making physical contact with Mr. Jones's vehicle, "officers encroached on a protected area." *Id*. And "where the [g]overnment obtains information by physically intruding on a constitutionally protected area . . . a search has undoubtedly occurred." *Id*. at 407 n.3.

The Supreme Court again examined the Fourth Amendment's protections through a property-rights lens in *Jardines.* There, the Court held that "using a drug-sniffing dog on a homeowner's porch to investigate the contents of the home is a 'search' within the meaning of the Fourth Amendment." 569 U.S. at 3. The Court concluded that the dog sniff was a search because law enforcement conducted their investigation in an area "immediately surrounding [Mr. Jardines's] house—in the curtilage of the house, which we have held enjoys protection as part of the home itself." *Id.* at 6. The Court did not consider whether the search implicated any reasonable expectation of privacy that Mr. Jardines might have had, but instead held "[t]hat the officers learned what they learned only by physically intruding on [Mr.] Jardines' property to gather evidence is enough to establish that a search occurred." *Id.* at 11.

The Eighth Circuit has not yet addressed how *Jardines* applies to apartment doors in common hallways, and under what particular factual circumstances. When presented with the opportunity to do so in *United States v. Perez*, the Eighth Circuit bypassed the Fourth Amendment issue and proceeded directly to a discussion of the good-faith exception to the exclusionary rule under *Leon*. 46 F.4th 691, 697–98 (8th Cir. 2022). The Court stated "[a]t the time . . . the dog sniff outside Apartment 10 [was conducted], we had neither expressly overruled *Scott* nor explained how *Jardines* applies to apartment doors in a common hallway." *Id*.

Nor has the Eighth Circuit addressed the issue this Court faces here: whether an ion swab of a doorknob and locking mechanism on the front door of a person's home is a Fourth Amendment search requiring a warrant. But in *United States v. Carter*, a case from

11

this District examining whether probable cause existed for a warrant to conduct an ion swab of a home's front doorhandle, the court noted that "[t]here is no dispute in this case that an ion scan is a search and that a warrant was required." No. 20-cr-0035 (MJD/KMM), 2020 WL 6136480, at *5 n.3 (D. Minn. Sept. 18, 2020), *R. & R. adopted,* 2020 WL 6135901 (D. Minn. Oct. 19, 2020). This Court addresses these issues as applied to Mr. Jones's case below.

**II.    Under *Jones* and *Jardines* the ion swab of the Mr. Jones's apartment doorknob and locking mechanism was an unconstitutional search.**

In *Carter's* analysis of whether probable cause existed for an ion swab warrant, the court started by examining how ion swabs work, as described over the years in published cases. *Id.* at *6. The court noted that ion swabs can be used by law enforcement to "detect the presence of illegal drugs by taking a 'swipe' or sample from a surface and then testing that sample with an ion-scan device." *Id*. In *United States v. Williams*, the court described how an ion scan operates:

> IonScan technology is designed to detect trace amounts of illicit materials—often amounts so small as to be imperceptible to the human eye. Samples, or "swipes," are taken of areas and objects thought to contain contraband. The samples are then run through the IonScan machine, which measures the amount of time it takes for ions from vaporized molecules to drift from one side of a tube into a collector. Because every substance has a unique, predictable drift time, the machine can identify a substance on a sample based on the amount of time it takes for the vaporized molecules to drift into the collector.

865 F.3d 1328, 1335 (11th Cir. 2017). While other courts' descriptions of the technology are not part of this case's factual record, they are nonetheless helpful to provide context to this Court's analysis. And these descriptions reflect Officer Fischbach's testimony that the

purpose of conducting the ion swab on Mr. Jones' apartment was "[t]o see if [there were] trace amounts of a controlled substance on the door [because] if there [were] trace amounts of a controlled substance on a door, then there [was] a good, high chance that there [were] controlled substances inside the apartment." (Tr. at 32.)

Another case from this District, *United States v. Martinez*, examined whether an ion swab of a storage unit door handle and padlock was a Fourth Amendment search that required a warrant. No. 22-cr-0086 (PJS/ECW), 2022 WL 18011789, at *1 (D. Minn. Dec. 30, 2022). The Court found that the ion swab of the defendant's padlock may constitute an unconstitutional search because law enforcement trespassed on the defendant's personal property when making physical contact with the padlock to obtain information. *Id*. at *2. The Court examined the issue through a trespass lens, consistent with *Jones*. *Id*. at *1–2. The Court noted that "[i]n *Jones*, the Supreme Court emphasized that the Fourth Amendment continues to embody a 'particular concern for government trespass,'" *id*. at *1 (quoting *Jones*, 565 U.S. at 406), and "made clear, that the Fourth Amendment protects against trespassory searches [of] those items ('persons, houses, papers, and effects') that it enumerates." *Id.* (quoting *Jones*, 565 U.S. at 411 n.8).

Similarly, this Court examines whether the ion swab of an apartment door in a common hallway is an unconstitutional trespassory search of an enumerated item—a home—and therefore requires a warrant. Because the Eighth Circuit has rejected a generalized expectation of privacy in common hallways of apartment buildings and has not provided guidance on what facts might give rise to an individualized expectation of privacy

within apartment buildings, but not inside of apartments, this Court looks to the *Jones* and *Jardines* trespass and property rights framework for guidance.

"For purposes of the Fourth Amendment, to prove a claim of trespass, one must have possession of the property in question and the ability to exclude others from entrance onto or interference with that property." *Id.* at *2 (quoting *United States v. Sweeney*, 821 F.3d 893, 900 (7th Cir. 2016)) (cleaned up). Like the defendant's padlock in *Martinez*, law enforcement officers here trespassed on Mr. Jones's home when they made physical contact with his doorknob and locking mechanism by swabbing them with the ion swab. There is no dispute in this case that #XXX is Mr. Jones's apartment. Because he is the occupying tenant in possession of the apartment, he may exclude others from entering or interfering with the property—his home. While Mr. Jones may not have the right to exclude individuals from the common hallway generally, he may exclude individuals from the threshold of his apartment or from interfering with his apartment's property, including his exterior doorknob. The doorknob, after all, is for Mr. Jones's use to enter and exit his home and may be used by others only with his express or implied consent. Though the doorknob exists in the common hallway, it is not for common use.

But trespass alone is not a search. Rather it must be coupled with an attempt to obtain information. *See Jones*, 565 U.S. at 407–08. That is exactly what happened here. Officer Fischbach testified that he swabbed Mr. Jones's door to "see if [there were] trace amounts of controlled substance on the door," because "if [there were] trace amounts of a controlled substance on the door, then there [was] a good, high chance, that there [were] controlled substances inside the apartment." (Tr. at 32.) As Officer Fischbach agreed

14

during his testimony, law enforcement made "physical contact on the outside" of Mr. Jones's door, to obtain "information about [what was] on the inside" of his apartment. (*Id*.) The government's warrantless physical intrusion on Mr. Jones's door to obtain information about the inside of his apartment constitutes a search in violation of the Fourth Amendment. *Jones*, 565 U.S. at 407.

*Jones* is not the only authority that guides this Court to its conclusion that the ion swab of Mr. Jones's apartment door was an unconstitutional search. *Jardines* supports this conclusion as well. Mr. Jones's door is part of his home and thus the doorknob and locking mechanism are also part of his home for Fourth Amendment purposes. 569 U.S. at 2. The doorknob on Mr. Jones's door is within the very boundary of his home, indeed part of the home itself. *See United States v. Charles,* 290 F. Supp. 2d 610, 614 (D.V.I. 1999), *aff'd,* 29 F. App'x 892 (3d Cir. 2002); *United States v. Dunn*, 480 U.S. 294, 300 (1987) ("What the occupant reasonably expects to be treated as his home determines the boundaries of the curtilage.") Although the Eighth Circuit in *Perez* declined to apply *Jardines* to common hallways, Judge Kelly's *Perez* concurrence is instructive here. Judge Kelly noted that although "a common hallway in an apartment building may not constitute curtilage in its entirety" the *Dunn* factors (that is, factors a court looks to in order to determine if an area is curtilage) are not completely "inapplicable either." *Perez*, 46 F.4th at 707 (Kelly, J., concurring).

"Whether a particular area is part of the curtilage of an individual's residence requires consideration of factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *Id*. at 705 (quoting

15

*United States v. Hopkins*, 824 F.3d 726, 731 (8th Cir. 2016)) (cleaned up). These factors include:

> the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by

*United States v. Bausby*, 720 F.3d 652, 656 (8th Cir. 2013) (quoting *Dunn*, 480 U.S. at 301).

Considering these factors, and in light of *Jardines* and the Eighth Circuit's post-*Jardines* cases,[6] Judge Kelly explained that "there is a meaningful distinction between a common hallway and the area inches from the bottom seam of an individual apartment door[]" and although "[t]he hallway in Perez's apartment building is commonly used space . . . the area immediately in front of the door is so closely associated with his individual residence that it can be considered part of the home." *Perez*, 46 F.4th at 707. The reasoning from Judge Kelly's concurring opining in *Perez* applies here. Indeed, like the common hallway in *Perez*, the hallway in Mr. Jones's apartment building is a common space, but his door is so closely associated with his individual residence that it can be considered part of his home. *Id.*

Furthermore, just as the Supreme Court in *Jardines* held that law enforcement's investigation with a drug sniff dog in a constitutionally protected area was an "unlicensed physical intrusion," 569 U.S. at 7, so too was law enforcement's investigation at Mr.

---

[6] *United States v. Hopkins*, 824 F.3d 726 (8th Cir. 2016) (holding that area immediately in front of a townhouse entry door was curtilage); *United States v. Burston*, 806 F.3d 1123 (8th Cir. 2015) (holding that area immediately outside an apartment window was curtilage).

16

Jones's door. The *Jardines* Court recognized that "the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds." *Id.* at 8 (quoting *Breard v. Alexandria*, 341 U.S. 622, 626 (1951)). "This implicit license" the Court continued, "typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id*. So too "a police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do." *Id.* (quoting *Kentucky v. King*, 563 U.S. 452, 469 (2011)) (cleaned up). But "the background social norms that invite a visitor to the front door do not invite him to conduct a search." *Id.* at 9.

Applied here, law enforcement had license to enter the common hallway in Mr. Jones's apartment building. They even had license to approach the door, knock, and wait for someone to answer. But law enforcement did not have license to approach Mr. Jones's door, then rub a swab against the handle and lock in order to obtain information about what was inside of his apartment. The Court therefore concludes that the government's warrantless physical intrusion on Mr. Jones's apartment door to gather information was a Fourth Amendment search. *Jones*, 565 U.S. at 404–05; *Jardines*, 569 U.S. at 5 (quoting *United States v. Knotts*, 460 U.S. 276, 286 (1983)).

Warrantless searches are per se unreasonable absent some exception to the warrant requirement. *California v. Acevedo*, 500 U.S. 565, 580 (1982). None of the exceptions to the warrant requirement are present here. Therefore, the Court recommends that evidence obtained directly from the unconstitutional search—the ion scan results—should be

17

suppressed. *Elkins v. United States*, 364 U.S. 206, 223 (1960) (applying the exclusionary rule to evidence obtained by state officers and used in federal prosecution).

### III. Although the ion swab was an unconstitutional search, the evidence obtained during the execution of the search warrant is admissible under the *Leon* good-faith exception.

The Court next turns to whether the evidence discovered during the execution of the warranted search should be suppressed. The Court would typically next decide whether the warrant affidavit, stripped of information from the unlawful search, still establishes probable cause for a search warrant. *United States v. Hernandez Leon*, 379 F.3d at 1027 (8th Cir. 2004) ("The sufficiency of a warrant affidavit which contains information from an unlawful search is evaluated after deleting that information.") But the Court need not decide that, because the government has established that law enforcement relied on the warrant in good faith.

Generally, evidence obtained in violation of the Fourth Amendment is subject to the exclusionary rule, with some exceptions. *United States v. Cannon*, 703 F.3d 407, 412 (8th Cir. 2013). One such exception occurs "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope, even if the warrant is subsequently invalidated." *Id*. (citing *Leon*, 468 U.S. at 920–21) (cleaned up). Courts have "have applied *Leon* where, as here, the search warrant application cites information gathered in violation of the Fourth Amendment." *Id*. at 413 (citing *United States v. Kiser*, 948 F.2d 418, 421 (8th Cir. 1991)). The *Leon* exception applies when the warrant is based on evidence obtained through a Fourth Amendment violation if the officers' pre-warrant conduct was "close enough to the line of validity to make the officers

18

belief in the validity of the warrant objectively reasonable." *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997) (cleaned up). But "[i]f the officers' prewarrant conduct is 'clearly illegal,' the good-faith exception does not apply." *Cannon*, 703 F.3d at 413 (quoting *Conner*, 127 F.3d at 667).

The government has established good faith reliance under *Leon*. Officer Fischbach testified during the evidentiary hearing that law enforcement officers did not apply for a search warrant before conducting the ion swab, because they relied on a ruling from a judge within their district that a warrant was not necessary to conduct a swab of an apartment door for purposes of an ion scan. That testimony is credited. Given this state-court ruling, it was reasonable for law enforcement to believe that no warrant was necessary to conduct the ion swab of Mr. Jones's apartment door.[7] And it was equally reasonable for law enforcement to rely on the validity of the warrant, even if it was based in part on the positive ion scan results. Therefore, under *Leon*'s good-faith exception to the exclusionary rule, the evidence seized from Mr. Jones's apartment during the execution of the search warrant is admissible. *United States v. Perry*, 531 F.3d 662, 665 (8th Cir. 2008).

## RECOMMENDATION

Accordingly, based on all the files, records, and proceedings above, **IT IS RECOMMENDED** that:

1. Mr. Jones's Motion to Suppress Evidence Obtained in Violation of the Fourth Amendment. (Doc. 24.) be **GRANTED IN PART** and **DENIED IN PART**;

---

[7] The government elicited testimony that law enforcement did not simply plow forward with a predetermined course, but rather discussed and considered whether to seek a warrant, buttressing the notion that their actions demonstrated reasoned decision making.

2. The ion scan results obtained as a direct result of the unconstitutional search should be suppressed; and

3. Evidence seized from Mr. Jones's apartment during the subsequent execution of the search warrant should be admitted.

Date: January 26, 2024

*s/Douglas L. Micko*
DOUGLAS L. MICKO
United States Magistrate Judge

**NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed findings and recommendations within 14 days after being served with a copy" of the Report and Recommendation.

A party may respond to those objections within 14 days after being served a copy of the objections. *See* Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).